IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

RICHARD A. PARKS JR.,                    :

        Plaintiff,                        :
                                Case No. 3:09cv141
        vs.                              :
                                JUDGE WALTER HERBERT RICE

TIMOTHY F. GEITHNER,                      :
Secretary, Department of the Treasury,
                           :
        Defendant.                        :

                           :

---

DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN
PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(DOC. #21); CONFERENCE CALL SET

---

        Plaintiff Richard A. Parks, Jr., an African-American formerly employed by the

Internal Revenue Service ("IRS"), filed suit against Timothy F. Geithner, Secretary

of the Department of the Treasury, alleging discrimination on the basis of race and

retaliation, both in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e, et seq.

        This matter is currently before the Court on Defendant's Motion for

Summary Judgment. Doc. #21. For the reasons set forth below, that motion is

sustained with respect to Plaintiff's race discrimination claims, and overruled with

respect to Plaintiff's retaliation claim.

I.      **Factual and Procedural Background**[1]

Plaintiff was employed as a Revenue Officer with the IRS in Dayton, Ohio,

from April of 2005 until his resignation in October of 2007.  Parks Dep. at 128.

During that time, he had several supervisors.  During his first year, he received

generally positive performance evaluations from Shawn Collins.  Hr'g Tr. at 284.[2]

Liz Dwyer, a white female, served as Plaintiff's' interim supervisor from late

October of 2005 until February of 2006.  Id. at 294.  On January 13, 2006,

Dwyer conducted a nine-month review of Plaintiff's case files and deemed his

performance to be inadequate in several respects.  She warned him that if the

deficiencies were not corrected, he would be fired.  Id. at 306-335; Parks Dep. at

41-42.

In February of 2006, Cathy Stose, also a white female, became Plaintiff's

permanent supervisor.  In March of 2006, Stose conducted Plaintiff's one-year

review.  She gave him a negative review, noting problems with customer

satisfaction, protection of the public interest, and problem solving.  As a result of

this evaluation, Stose told Plaintiff that he would be placed on an "opportunity

period" at some unspecified point in the future.  Parks Dep. at 47.  An "opportunity

---

[1]  As required on a motion for summary judgment, the Court views the facts and inferences drawn therefrom in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

[2]  All references to a "hearing transcript" refer to the transcript of the hearing held in June of 2008 before an administrative law judge at the Equal Employment Opportunity Commission.  That transcript was filed with the Court.  Docs. ##31–36.

period" is a sixty-day period during which a failing employee is given a chance to demonstrate improvement, and bring his performance up to a satisfactory level during a period of close supervision. The employee will be terminated if the subsequent performance is not viewed as having been "minimally successful." Ex. C to Parks Dep.

The working relationship between Stose and Plaintiff continued to deteriorate. In May of 2006, Stose lowered Plaintiff's overall performance rating from 3.0 to 2.0. Parks Dep. at 44. According to Plaintiff, she often treated him in a rude or hostile manner. She would frequently sigh and roll her eyes when Plaintiff knocked on her door to ask a question about a case file. She once stuck her tongue out at him, and when they passed in the hallway, she would back away like she did not want to touch him. Id. at 62. When she asked him questions, she would become annoyed and berate him if he took too long to respond. Hr'g Tr. at 45-47.

In June of 2006, Stose called Plaintiff into her office to discuss a complaint she had received about him from a taxpayer. When Plaintiff took issue with her characterization of the situation, Stose became angry, screamed at him, and called him "ignorant." Plaintiff responded that he did not appreciate being called ignorant, and that he felt it was equivalent to using the word "nigger." Stose responded: "Well, you are. You're just ignorant." Id. at 44-45. A few days later, Plaintiff and Stose got into another heated exchange, and she again called him ignorant. Parks Dep. at 56-57.

3

Stose's negative evaluations and generally hostile demeanor toward him prompted Plaintiff, in June of 2006, to make contact with the Equal Employment Opportunity ("EEO") office associated with the Dayton branch of the IRS. Id. at 28. In August of 2006, before a formal complaint was filed, the EEO office began mediation proceedings. Stose and her supervisor, Anita Van Order, arranged to have Carmen Valentin, an IRS officer from New Jersey, come to the Dayton office on special assignment to perform an outside evaluation of Plaintiff's work. They told Valentin that she was to review his work because he had filed an EEO complaint. Valentin examined several cases that Plaintiff had worked on and concluded, as had Stose, that Plaintiff was failing many aspects of his duties as an IRS revenue officer. Hr'g T. at 410-27.

Near the end of September, when no settlement had yet been reached, Plaintiff's union representative, Amy Kruer, informed him that he needed to file a formal complaint soon, or risk losing the option of filing a lawsuit. Plaintiff therefore filed a formal complaint with the EEO office of the Department of the Treasury on October 3, 2006. Ex. A to Parks Dep. Amended complaints, containing additional claims, were filed on December 28, 2006, and June 21, 2007. Ex. B to Parks Dep.

On October 16, 2006, less than two weeks after the formal complaint was filed, Stose called Plaintiff into her office for a meeting. She told him that his performance was unacceptable in several areas, and that he was being placed on an "opportunity period" for the next 60 days. Ex. C to Parks Dep. In that meeting,

4

Stose told him that she felt that he and the union were "playing games" with management by filing the formal complaint, and that the IRS "had to protect itself." Parks Dep. at 81; Hr'g Tr. at 57. She offered the same explanation to Kruer. Hr'g Tr. at 150. In early December, during a meeting, Stose snapped at Plaintiff in front of his peers. Id. at 222.

On March 13, 2007, Plaintiff was informed in writing that he had not shown sufficient progress during the opportunity period and would be receiving a formal notice of a proposed dismissal in the near future. Ex. D to Parks Dep. From October of 2006, when Plaintiff's 60-day opportunity period began, and March of 2007, when he was informed he did not successfully complete that opportunity period, Stose failed to provide Plaintiff with additional training or assistance in remedying the identified problems. Parks Dep. at 96-99.

On March 28, 2007, Stose called Plaintiff into her office to discuss an alleged misuse of his business credit card. She accused him of paying his bill late and told him that she was referring him to the IRS investigative unit. Id. at 105-09. On July 13, 2007, Plaintiff received a notice of a proposed disciplinary suspension based on the alleged misuse of the credit card. Ex. E to Parks Dep. On July 13, 2007, Plaintiff also received formal notice of his proposed dismissal which was to occur "at any time after thirty (30) calendar days" from the date of receipt of the letter. Ex. F to Parks Dep.

On October 19, 2007, prior to receiving any final notice of termination, Plaintiff resigned from his job with the IRS, and took a new job with the Department of Veterans Affairs in Cincinnati. Hr'g Tr. at 69-70; Ex. G to Parks Dep.

The EEO investigation into Plaintiff's complaint continued. Once the investigation was concluded, Plaintiff was given the option of: (1) a hearing before an EEOC administrative judge with a subsequent final decision by the Department of Treasury; (2) a final decision by the Department of Treasury without a hearing; or (3) withdrawal of his complaint. See Ex. B to Parks Dep. Plaintiff chose to have a hearing before an administrative law judge. A three-day hearing was held in June of 2008. Both sides presented evidence and witnesses. See Docs. ##31–36.

On April 2, 2009, since the administrative law judge had not yet issued a decision, Plaintiff filed suit in federal court, asserting claims of race discrimination and retaliation.[3] The parties conducted no formal discovery, relying instead on the extensive discovery associated with the administrative hearing. Defendant has now moved for summary judgment on both counts.

## II.   Summary Judgment Standard

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's

---

[3] A federal employee is entitled to bring a Title VII suit in federal district court: (1) within 90 days of the receipt of an agency's final determination of his claim; or (2) after 180 days from the date of filing an administrative complaint, if no final action has been taken. 42 U.S.C. § 2000e-16(c).

6

case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. Id. at 323; see also Boretti v. Wiscomb, 930 F.2d 1150, 1156 (6th Cir. 1991).

"Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." Talley v. Bravo Pitino Rest., Ltd., 61 F.3d 1241, 1245 (6th Cir. 1995); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. Celotex, 477 U.S. at 324. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." Michigan Prot. & Advocacy Serv., Inc. v. Babin, 18 F.3d 337, 341 (6th Cir. 1994).

7

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[4] Summary judgment shall be denied "[i]f there are . . . 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" Hancock v. Dodson, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted). In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. Anderson, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe; rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, Federal Practice and Procedure Civil 3d § 2726 (1998).

In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied, 494 U.S. 1091 (1990); see also L.S. Heath & Son, Inc. v. AT&T Info. Sys., Inc., 9 F.3d 561 (7th Cir. 1993); Skotak v. Tenneco Resins, Inc., 953 F.2d 909, 915 n.7 (5th Cir. 1992), cert. denied, 506

---

[4] Amendments to Federal Rule of Civil Procedure 56 became effective on December 1, 2010. Nevertheless, because Defendant's motion was filed prior to that date, the prior version of the Rule is quoted here.

U.S. 832 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment . . . ."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

**III.   Analytical Framework: The <u>McDonnell Douglas</u> Burden Shifting Scheme**

Plaintiff alleges race discrimination and retaliation in violation of Title VII. The analytical framework for a Title VII claim is well established, having been set out by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).

Absent direct evidence of discrimination, the plaintiff must first establish a prima facie case by presenting facts that, if not explained, give rise to an inference of unlawful discrimination. <u>Id</u>. at 802. The burden then shifts to the employer to articulate some legitimate nondiscriminatory reason for the adverse employment action. <u>Id</u>. If the employer satisfies this burden of production, the presumption of discrimination drops away. <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 142-43 (2000). The plaintiff must then prove, by a preponderance of the evidence, that the reason offered was pretextual. <u>Id.</u>; <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981).

9

## IV.    Discrimination

The Court turns first to Plaintiff's two claims of race discrimination.  Count I of Plaintiff's Complaint alleges that: (1) that the IRS discriminated against him by "treating him differently than white employees and terminating his employment," and (2) that Defendant's conduct created a "hostile work environment."  Compl. at ¶¶ 29-34.  Both types of claims are cognizable under Title VII, which makes it unlawful for an employer to discriminate against an individual "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).

### A.    Disparate Treatment Claim

Defendant argues that Plaintiff's disparate treatment claim fails in two ways: (1) a portion of the claim is time-barred; and (2) the claim fails on the merits.

#### 1.    Failure to Exhaust Administrative Remedies

A federal employee who sues his employer under Title VII must satisfy "rigorous administrative exhaustion requirements and time limitations."  McFarland v. Henderson, 307 F.3d 402, 406 (6th Cir. 2002) (quoting Brown v. General Serv. Administration, 425 U.S. 820, 833 (1976)).  The employee must initiate contact with an EEO Counselor "within 45 days of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action."  29 C.F.R. § 1614.105(a)(1).  Each discrete discriminatory act must be reported to an EEO Counselor within 45 days of its occurrence or it is time-barred.

10

See National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 111-113 (2002) (holding that even if related to acts alleged in a timely filed charge, discrete discriminatory acts are not actionable if not reported in a timely manner).

In his Motion for Summary Judgment, Defendant argues that, to the extent Plaintiff alleges, in part, that Defendant discriminated against him by "terminating his employment," Compl. ¶ 32, Plaintiff failed to administratively exhaust this claim. He received the notice of proposed dismissal on July 13, 2007, but never contacted the EEO about amending his complaint to include a claim of wrongful termination or constructive discharge. He admitted at his deposition that he did not do so because he was not terminated; rather, he resigned. Parks Dep. at 125-28.

Defendant further argues that Plaintiff failed to exhaust his administrative remedies with respect to Claims (7) and (8) as set forth in the Second Amended EEO complaint:

7. On March 13, 2007, the Complainant received a written document which states that he did not pass his "opportunity period" and that he will be terminated sometime in the future; and

8. During the time that the Complainant served on his "opportunity period" he was not given the proper assistance needed, such as a coach and one-on-one time with his manager[.]

Ex. B to Parks Dep.[5]

---

[5] In his Reply brief, Defendant also argues, for the first time, that Plaintiff failed to exhaust administrative remedies with respect to the ninth claim as set forth in the Second Amended EEO Complaint. However, because Plaintiff has not had the opportunity to respond to this argument, the Court need not consider it. See

Defendant maintains that these were discrete acts, requiring contact with the EEO within 45 days after their occurrence. It is undisputed that Plaintiff did not contact the EEO about these particular incidents until June 6, 2007. This was more than 45 days after he received the March 13, 2007 letter, and more than 45 days after he finished serving his "opportunity period," which ran from October 2006 until December of 2006.

Plaintiff concedes that he did not file any EEO amendments indicating that he was wrongfully terminated or constructively discharged, and that he failed to make timely contact with the EEO concerning the allegations set forth in claims (7) and (8). Plaintiff nevertheless argues that Defendant has waived its exhaustion defense by failing to raise the issue during the EEO investigation, in a pre-hearing brief submitted to the EEO, or at the hearing before the administrative law judge. See Horton v. Potter, 369 F.3d 906, 911 (6th Cir. 2004) (noting that the 45-day requirement is not a jurisdictional requirement, and is subject to waiver, estoppel and equitable tolling).

In reply, Defendant argues that because neither the administrative law judge nor the Treasury Department issued a decision on the merits of Plaintiff's claims, no waiver occurred. As the Sixth Circuit held Horton, a federal agency does not waive the defense of untimeliness simply by receiving and investigating an employee's complaint of discrimination. "Rather, waiver occurs when the agency

---

United States v. Crozier, 259 F.3d 503, 517 (6th Cir. 2001) ("We will generally not hear issues raised for the first time in a reply brief.").

decides the complaint on the merits without addressing the untimeliness defense."

Id. (citing Bowden v. United States, 106 F.3d 433, 438 (D.C. Cir. 1997)).[6]

In this case, Plaintiff elected to participate in a hearing before the EEOC. Had Plaintiff waited for the administrative law judge to issue a written decision, the Treasury Department would have then issued its final decision on the merits of Plaintiff' complaint. However, when the administrative law judge failed to issue a decision within 180 days, Plaintiff elected to file this lawsuit instead. Ghiz Aff. ¶ 8, Ex. 1 to Doc. #37. Because the Treasury Department did not decide the complaint on the merits, Plaintiff's waiver argument lacks merit.[7]

The Court concludes that Plaintiff failed to provide the EEO Counselor with timely notice of allegations that Defendant discriminated against him by: (1) "terminating" him; (2) finding that he did not successfully pass his "opportunity period;" and (3) failing to provide proper assistance, such as a coach and one-on-one time with his manager, during his "opportunity period." These claims are,

_____

[6] In a similar vein, courts have held that when an employee chooses to file suit before the EEOC reaches a decision on the merits, the employee can no longer successfully argue that an employer waived a timeliness defense by failing to raise it before the EEOC. See Mercado v. Ritz-Carlton San Juan Hotel, Spa & Casino, 410 F.3d 41, 45 (1st Cir. 2005).

[7] Defendant also argues that he "repeatedly objected to consideration of a termination claim at the hearing as being beyond the scope of the claims to be considered." Doc. #45, at 8. In light of its holding that the absence of a decision on the merits by the Treasury Department forecloses Plaintiff's waiver argument, the Court need not address this alternative argument.

therefore, time-barred and will not be considered as part of Plaintiff's disparate

treatment claim.

### 2. Merits of Disparate Treatment Claim

Defendant argues that it is entitled to summary judgment on the merits of

the remainder of Plaintiff's disparate treatment claim:

1. Twice during the month of June 2006, the Complainant's manager referred to him as "ignorant":
2. On May 11, 2006, the Complainant's appraisal was lowered from an overall rating of 3.0 to a 2.0, which did not reflect his actual work performance and prohibited the Complainant from receiving a promotion: and
3. In June 2006, the Complainant's manager referred to him as "ignorant" which was heard by fellow employees:
4. On October 16, 2006, the Complainant received a "last chance letter" and was told by his manager that he received the letter for filing an EEO formal complaint:
5. On December 5, 2006, the Complainant's manager treated him in a demeaning manner in front of his peers:
6. On March 7, 2007, the Complainant's manager told another employee that they (management) did not get the right people for the job so management has decided to eliminate these hires, revise the hiring process, and hire the right people;

* * *

9. On March 28, 2007, the Complainant's group manager chastised the Complainant for paying his IRS credit card late, and threatened to take a disciplinary action against him as well as delaying the approval of his travel expenses.

Ex. B to Parks Dep.

### a. Direct Evidence of Discrimination

Plaintiff maintains that he has direct evidence of race discrimination. Direct

evidence "is that evidence which, if believed, requires the conclusion that unlawful

discrimination was at least a motivating factor in the employer's actions." *Jacklyn*

14

*v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999).

Plaintiff first notes that on two separate occasions, Stose called him "ignorant." Even assuming that this is true, it does not require the conclusion that Stose did so because Plaintiff is African-American. Despite Plaintiff's subjective belief to the contrary, the word "ignorant" carries no inherent racial connotation. Therefore, this does not constitute direct evidence of racial discrimination.

Plaintiff also notes that at the EEO hearing, when Stose was asked if she had ever referred any white employees to the Investigative Unit for misuse of a credit card, she replied, "[w]ell, I've never had any white employees that have had credit card issues." Hr'g Tr. at 683. Likewise, when asked whether she had ever questioned other employees about their use of sick leave, she responded, "I would never have to question anybody else." Id. at 701. Again, a racial animus might be inferred from Stose's answers, but neither statement *requires* the conclusion that Stose treated Plaintiff less favorably because of his race.

Having concluded that Plaintiff has not offered any direct evidence of race discrimination, the Court turns to the McDonnell Douglas burden-shifting analysis.

**b.    Indirect Evidence of Discrimination**

In order to establish a prima facie case of discrimination, a plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he was qualified for his position; (3) he was subjected to an adverse employment decision; and (4) a similarly situated person outside the protected class was treated more favorably.

Vincent v. Brewer Co., 514 F.3d 489, 494 (6th Cir. 2007); Clay v. United Parcel Serv. Inc., 501 F.3d 695, 703 (6th Cir. 2007). In moving for summary judgment, Defendant concedes that Plaintiff is a member of a protected class, but attacks all the remaining prongs of the prima facie case.

### i.    Qualifications

Defendant asserts that Plaintiff was not qualified for his position, as documented by his performance failures and disciplinary history. In so arguing, Defendant improperly conflates the stages of the burden-shifting analysis. See Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 660 (6th Cir. 2000) (warning against importing the later stages of the McDonnell Douglas inquiry into the initial prima facie stage.)

"At the prima facie stage, a court should focus on a plaintiff's *objective* qualifications to determine whether he or she is qualified for the relevant job." Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 575 (6th Cir. 2003) (emphasis in original). The focus is on the plaintiff's education, experience, and skills. Id. at 576.

Defendant does not argue that Plaintiff was not objectively qualified for his job. Rather, Defendant cites to subjective, qualitative evaluations of Plaintiff's job performance. These are the same allegedly non-discriminatory reasons given by Defendant to justify its actions. The Court concludes that, for summary judgment purposes, Plaintiff has succeeded in demonstrating that he was objectively qualified for his position.

### ii.    Adverse Employment Action

Defendant next argues that Plaintiff cannot demonstrate the third prong of his prima facie case because none of the actions complained of was "materially adverse." In the context of a Title VII discrimination claim, an adverse action is one that results in a "materially adverse change in the terms or conditions of employment." Allen v. Michigan Dep't of Corrections, 165 F.3d 405, 410 (6th Cir. 1999). As the Sixth Circuit explained in Spees v. James Marine, Inc., 617 F.3d 380 (6th Cir. 2010), a bruised ego is not enough. "Adverse employment actions are typically marked by a 'significant change in employment status,' including 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Id. at 391 (internal citations omitted).

Perhaps somewhat tellingly, Plaintiff completely ignores this element of the prima facie case, focusing solely on whether he was treated less favorably than similarly situated white employees. Based on the evidence presented, no reasonable jury could find that Plaintiff suffered a materially adverse employment action.

Calling Plaintiff ignorant and berating him in front of his coworkers does not rise to the level of an adverse employment action. Nor does a statement that management did not hire the "right people for the job." Although these incidents may have resulted in a bruised ego, they did not materially alter the terms or conditions of Plaintiff's employment. See, e.g. Michael v. Caterpillar Fin. Servs.

17

Corp., 496 F.3d 584, 594 (6th Cir. 2007) (a confrontation between a manager and subordinate in which harsh words are exchanged does not amount to a materially adverse employment action).

Plaintiff also complains about the fact that Stose lowered his overall rating from 3.0 to a 2.0. However, absent some showing that this resulted in a materially adverse change in the terms or conditions of his employment, a negative performance evaluation is not enough. Although Plaintiff alleges that the lowered overall rating prevented him from receiving a promotion, he points to absolutely no evidence in the record to support that claim.

Likewise, the October 16, 2006, letter, informing him that he would be terminated if his performance did not improve during the following 60-day opportunity period, does not constitute an adverse employment action. The Sixth Circuit has expressed "significant doubt" about whether a 90-day performance improvement plan that does not significantly alter an employee's responsibilities, pay, or work hours constitutes a materially adverse employment action in the context of a discrimination claim. See Michael, 496 F.3d at 595.[8] Plaintiff has pointed to no evidence that the initiation of this "opportunity period" resulted in a significantly different change in responsibilities or any change in pay or benefits.

_____

[8] As discussed later in this Decision, the Supreme Court, in Burlington Northern and Santa Fe Railway Co. v. White, 548 U.S. 53 (2006), adopted a more liberal standard of what constitutes an "adverse employment action" in the context of a retaliation claim. However, in Michael, the Sixth Circuit stated that Burlington Northern did not alter the standard to be applied to claims of discrimination. 496 F.3d at 594.

18

The same analysis applies to Plaintiff's claim that Stose chastised him for paying his credit card late, referred him to the Investigative Unit, and threatened to suspend him without pay.  Plaintiff does not allege that any of these actions culminated in any actual disciplinary action, significant change in responsibilities, or change in pay or benefits.  Plaintiff voluntarily resigned before any final action was taken.

Based on the evidence presented, no reasonable jury could find that Plaintiff suffered an "adverse employment action," as that term has been defined by the Sixth Circuit in the context of discrimination claims.  Because Plaintiff has failed to create a genuine issue of material fact concerning this essential element, there is no need for the Court to address the question of whether Plaintiff was treated less favorably than similarly situated white employees.  Nor is there any need for the Court address the remaining steps of the McDonnell Douglas analysis.

Because Plaintiff has failed to establish a prima facie case of disparate treatment, Defendant is entitled to summary judgment on this portion of Plaintiff's claim of race discrimination.

### B.    Hostile Work Environment Claim

The Court now turns to Plaintiff's claim that he was subjected to a hostile work environment based on his race.  "Title VII offers employees protection from a 'workplace [ ] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. . . .'"  Barrett v. Whirlpool Corp., 556

19

F.3d 502, 514 (6th Cir. 2009) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).

The Sixth Circuit has recently summarized the relevant prima facie inquiry as follows:

> To establish a prima facie case of a racially hostile work environment, a plaintiff must demonstrate that (1) she was a member of a protected class; (2) she was subjected to unwelcome racial harassment; (3) the harassment was based on race; (4) the harassment unreasonably interfered with her work performance by creating an intimidating, hostile, or offensive work environment; and (5) the employer is liable.

Barrett, 556 F.3d at 515.

In moving for summary judgment, Defendant attacks the third and fourth prongs of Plaintiff's prima facie case. Defendant argues that any harassment Plaintiff experienced was racially neutral, and therefore beyond the purview of Title VII. Defendant further argues that the incidents complained of were so minor and isolated that Plaintiff cannot demonstrate that he suffered the kind of severe or pervasive harassment that could unreasonably interfere with one's work performance.

In his Memorandum in Opposition to Defendant's Motion for Summary Judgment, Plaintiff relies on the following conduct in support of his hostile work environment claim:

- When Stose first started, Anita VanOrder indicated that Plaintiff "needed to lose the correction guard mentality," a reference to his previous job as a corrections guard. Hr'g Tr. at 664. Plaintiff maintains that this comment tainted Stose's opinion of him.
- Stose called him "ignorant," and continued to do so after he informed her that he felt this was like being called a "nigger." Id. at 45.

20

- If Plaintiff was not quick enough to answer a question, Stose would berate him.  Id. at 45-46.
- When Plaintiff came to Stose with questions, she would roll her eyes, make faces, and once, she stuck out her tongue.  Id. at 46.
- If Plaintiff passed Stose in the hallway, she would back up against the wall to avoid him.  Id. at 47.
- Although Stose felt that Plaintiff was a physical threat to others, she did not discipline him for it.  Id. at 662-63.
- Stose signed off on Plaintiff's many absences, but then lowered his performance rating because of them.  She also asked him to provide proof of illness.  When asked if she had required this of other employees, she replied, "I would never have to question anybody else."  Id. at 701.
- Stose referred Plaintiff to the Investigative Unit based on a taxpayer complaint, something she had never done with any other employee.  Hr'g Tr. at 677, 682.
- Stose also referred Rick Corbin, another African-American employee, to the Investigative Unit for misuse of a government credit card.  When asked if she had ever referred a white employee to the Investigative Unit, Stose replied that she "never had any white employees that have had credit card issues."  Id. at 683.
- Stose treated Plaintiff in an insulting and demeaning manner in front of his peers.  Id. at 208, 222.
- During the EEO mediation process, Van Order brought in an outside supervisor to conduct an independent evaluation of Plaintiff's work, and tainted the evaluation by telling her that Plaintiff had filed an EEO complaint.  Id. at 414.
- Stose had a contentious working relationship with other black employees too.  Of the other four African-American employees she supervised, Wallace had already left, and it appeared that another one, Rick Corbin, was being forced out.  Id. at 92, 224, 724.

Doc. #37, at 18-23.

### 1.  Harassment Based on Race?

In order to survive summary judgment on this claim, Plaintiff must present sufficient evidence from which a reasonable jury could find that the alleged harassment was based on race.  Defendant correctly points out that the conduct complained of is, at least on the surface, completely race-neutral.  Moreover,

Plaintiff does not allege that he, or anyone else, was ever subjected to any racial slurs or racially offensive conduct in the workplace.[9]  Instead, he asks the Court to infer a racially discriminatory animus from the fact that Stose treated him disrespectfully, and also appeared to have a contentious working relationship with at least two other African-American employees under her supervision.

"Title VII does not prohibit all verbal or physical harassment in the workplace."  It is directed only at harassment perpetrated against an individual "because of" that individual's membership in a protected class.  Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 80 (1998).  A plaintiff claiming a hostile work environment based on race, "need not show that the complained-of conduct was explicitly racial, but must show that it had a racial character or purpose."  Yancick v. Hanna Steel Corp., 653 F.3d 532, 544 (7th Cir. 2011).

The Sixth Circuit has explained that "even though a certain action may not have been specifically racial in nature, it may contribute to the plaintiff's proof of a hostile work environment if it would not have occurred but for the fact that the plaintiff was African American."  Jackson v. Quanex Corp., 191 F.3d 647, 662 (6th Cir. 1999).  See also Clay v. United Parcel Serv., Inc., 501 F.3d 695, 706 (6th Cir. 2007) ("Conduct that is not explicitly race-based may be illegally race-based and properly considered in a hostile-work-environment analysis when it can be shown that but for the employee's race, she would not have been the object of harassment.").

---

[9]  Plaintiff's subjective belief that being called "ignorant" was akin to being called a "nigger" is not compelling, as the word "ignorant" carries no racial connotations.

The question in this case is whether Plaintiff can establish that the conduct alleged would not have occurred "but for" Plaintiff's race. Undoubtedly, this task would be easier if Plaintiff had some evidence of racial slurs or other racially-offensive conduct to support an inference of a racial animus. These are the traditional hallmarks of a hostile work environment claim. See Jackson, 191 F.3d at 662 (noting that use of racial epithets may create an inference that racial animus motivated other conduct as well); Williams v. General Motors Corp., 187 F.3d 553, 565-66 (6th Cir. 1999) (holding that disparate treatment, "combined with the gender-specific epithets," created an inference that harassment was based on plaintiff's gender).

Nevertheless, the lack of racial slurs or racially-offensive conduct does not foreclose a finding that, but for Plaintiff's race, he would not have been harassed. In Clay, as here, the plaintiff was not subject to any racially derogatory comments. She presented evidence, however, that her supervisor singled her out and disciplined her for conduct that her white coworkers were not disciplined for. The court found that plaintiff's affidavit and the affidavits of two coworkers "created an inference, sufficient to survive summary judgment, that race was the motivating factor behind [her supervisor's] behavior." 501 F.3d at 707.

In this case, viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that Stose's conduct was motivated by race. As Plaintiff notes, Stose supervised five African-American employees, two of them were very close to retirement age. Of the remaining three – Plaintiff, William Wallace, and

23

Rick Corbin – Plaintiff and Mr. Wallace have found jobs elsewhere. Wallace testified that Stose nit-picked everything he did. He finally left because, in her eyes, he "couldn't do nothing right." Hr'g Tr. at 86-87.

Corbin, a 19-year employee of the IRS, testified that although he had previously received good performance evaluations, his overall rating dropped dramatically as soon as Stose became his supervisor. Id. at 102-04, 114. At the hearing, he expressed strong concern about being terminated in the near future. Id. at 112. When asked if he believed that his negative evaluations were based on his race, he simply noted that "nothing seems to add up here." He noted that until Stose arrived, Wallace and Plaintiff had received satisfactory evaluations. Now, despite the fact that Corbin was working harder than ever, he was also suddenly receiving negative evaluations. Id. at 116.

Plaintiff also notes that he and Corbin were the only two employees that Stose referred to the Investigative Unit for credit card misuse, id. at 683, and Plaintiff was the only employee she referred to that Unit as a result of a taxpayer complaint.

In the Court's view, based on the evidence presented, a jury could reasonably infer that Stose's treatment of Plaintiff was motivated by a racial animus. The Court therefore turns to the question of whether such treatment unreasonably interfered with Plaintiff's work performance, the fourth prong of the prima facie case.

## 2. Unreasonable Interference With Work Performance?

In order to be actionable, "the workplace must be permeated with 'discriminatory intimidation, ridicule or insult' sufficiently severe or pervasive to alter the conditions of employment." Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 333 (6th Cir. 2008) (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986). This element involves an objective and subjective inquiry, such that the work environment in question must be "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998).

The Court must look at the totality of the circumstances, considering factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). In addition to conduct directed at Plaintiff, the Court may also consider evidence of other acts of harassment that Plaintiff knew about, even if they were directed at other employees or occurred outside his presence. Hawkins, 517 F.3d at 335.

In the Court's view, based on the evidence presented, no reasonable jury could find that Plaintiff's workplace was permeated with a racial animus sufficiently severe or pervasive to alter the conditions of his employment. Plaintiff alleges that, on a couple of occasions, Stose called him "ignorant" and insulted him in front of his coworkers. She often treated him disrespectfully,

25

avoiding him in the hallway, rolling her eyes and making faces when he came to her for help, and berating him when he was too slow to answer a question. When he was absent, she required proof of illness. She also referred him to the Investigative Unit following a taxpayer complaint and again for misuse of a credit card. Finally, she gave him negative performance evaluations.

As an initial matter, as previously noted, there is a jury question as to whether *any* of this conduct was racially motivated. But even assuming that it was, in fact, racially motivated, the conduct at issue, taken as a whole, is neither objectively severe enough nor pervasive enough to be actionable under Title VII. The Court notes that none of the conduct alleged is physically threatening or physically humiliating. More importantly, Plaintiff has pointed to no cases in which allegations of this nature have been found sufficient to create a triable issue of fact with respect to the fourth prong of the prima facie case, particularly in the absence of any racial slurs or racially-offensive conduct.

In Clay, the Sixth Circuit noted that even though the question of "whether conduct is severe or pervasive is quintessentially a question of fact," courts may sometimes determine, as a matter of law, that the conduct complained of is not actionable. 501 F.3d at 707 (internal quotations and citations omitted). Based on the evidence presented here, the Court concludes, as a matter of law, that Plaintiff cannot show that the conduct at issue is sufficiently severe or pervasive enough to alter the conditions of his employment. Accordingly, Defendant is entitled to summary judgment on Plaintiff's hostile work environment claim.

26

**V.    Count II: Retaliation**

Title VII also makes it unlawful for an employer to discriminate against an employee because he has opposed an unlawful employment practice or because he has made a charge of discrimination.  42 U.S.C. § 2000e-3(a).  In Count II of the Complaint, Plaintiff alleges that Defendant retaliated against him by "improperly evaluating and disciplining him" in response to his complaints of race discrimination made to the EEO office.  Compl. ¶¶ 36-37.

In October of 2006, just two weeks after Plaintiff filed his formal EEO complaint, he was placed on a 60-day opportunity period.  Stose told Plaintiff and his union representative that because they were "playing games" with management, "[w]e had to protect ourselves."  Hr'g Tr. at 57, 149-50.  A couple of months after the formal complaint was filed, Stose berated Plaintiff in front of his coworkers.  Id. at 222.  She also referred him to the Investigative Unit for an alleged misuse of a government credit card.  Id. at 682-83.[10]

To establish a prima facie case of retaliation, Plaintiff must prove that: (1) he engaged in an activity protected by Title VII; (2) this exercise of his rights was known to Defendant; (3) Defendant thereafter took an adverse employment action against him *or* Plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there is a causal connection between the protected activity

---

[10]  Plaintiff also alleges that Stose provided him with no one-on-one coaching during the opportunity period that began in October of 2006.  However, as previously held, this particular claim is time-barred.

27

and the adverse employment action or harassment.  <u>Morris v. Oldham County</u>

<u>Fiscal Court</u>, 201 F.3d 784, 792 (6th Cir. 2000).

Defendant, in moving for summary judgment, attacks only the third element, arguing that Plaintiff cannot show that Defendant took any adverse employment action against him or that he was subjected to severe or pervasive retaliatory harassment.[11]

As an initial matter, Defendant notes that to the extent Plaintiff alleges that Defendant retaliated against him by "improperly evaluating him," the only evaluation at issue before the EEOC was Stose's May 11, 2006, decision to lower his appraisal from an overall rating of 3.0 to 2.0.  This occurred *before* Plaintiff first made contact with the EEO office in June of 2006.  Plaintiff does not address this argument, impliedly conceding that the May 11, 2006, evaluation falls outside the scope of the retaliation claim.  The Court therefore turns to Plaintiff's allegation that Defendant retaliated against him by "improperly disciplining him."

Defendant maintains that although it threatened to take disciplinary action against him, it never followed through because Plaintiff decided to resign instead. Defendant contends that mere threats of discipline are insufficient to constitute an adverse employment action.  The Court disagrees.

---

[11] In its Reply memorandum, Defendant also argues for the first time that Plaintiff cannot establish the fourth element of his prima facie case, the existence of a causal connection between his protected activity and an adverse employment action.  Again, because Plaintiff has not had the opportunity to respond to this argument, the Court need not consider it.  <u>See</u> <u>United States v. Crozier</u>, 259 F.3d 503, 517 (6th Cir. 2001).

As the Sixth Circuit has noted, "a plaintiff's burden of establishing a materially adverse employment action is less onerous in the retaliation context than in the anti-discrimination context." Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 595-96 (6th Cir. 2007) (citing Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)). A plaintiff alleging retaliation need only show that the action taken by the employer "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern, 548 U.S. at 68 (internal quotation omitted). "[P]etty slights, minor annoyances, and simple lack of good manners will not create such deterrence." Id.

The fact that Stose berated Plaintiff in front of his peers does not constitute a materially adverse action in the retaliation context. See Michael, 496 F.3d at 594 ("A confrontation . . . in which harsh words were exchanged, does not amount to a materially adverse action").

Defendant also argues that being placed on the 60-day opportunity period did not cause Plaintiff any significant harm. Defendant notes that employees are often told that they need to improve their performance, and placement on an opportunity period does not guarantee termination. The hope is that those employees will successfully complete the opportunity period and be able to keep their jobs.

However, analyzing Defendant's argument and the relevant facts in light of the Burlington Northern standard, the Court is persuaded that, under the circumstances presented here, placement on an opportunity period is a materially

adverse action in the retaliation context and might well dissuade a reasonable employee from making a charge of discrimination. The record shows that placing an employee on an "opportunity period" represents an affirmative step in a progression that may ultimately result in termination. If the employee does not improve his performance within 60 days, he is either reassigned to another position or terminated. Ex. C to Parks Dep. Furthermore, the employee is closely monitored during this time. Id. Once an employee is subject to such review, indiscretions and errors that might otherwise be trivial acquire the potential to push him "over the edge." In short, while Plaintiff's job functions and pay did not change, his opportunity period moved him decidedly closer to termination.

The Sixth Circuit considered a similar factual scenario in Michael. There, the plaintiff was placed on a 90-day "performance improvement plan" that included increased monitoring of her work performance and her interaction with subordinates. See Michael, 496 F.3d at 598. The Sixth Circuit found that this adverse action "appear[ed] to meet [the] relatively low bar" set by Burlington Northern for claims of retaliation. Id. at 596.

More recently, the district court for the Eastern District of Pennsylvania concluded that a similar opportunity period issued by the IRS constituted an adverse action in the retaliation context. Boandl v. Geithner, 752 F. Supp.2d 540, 565 (E.D. Pa. 2010) ("Under the Burlington Northern standard, I believe an objective person would be dissuaded from pursuing a claim of discrimination following this treatment [being placed on an opportunity period by an IRS supervisor].").

30

The Court therefore finds that the 60-day opportunity period constitutes a materially adverse employment action. Regardless of whether Plaintiff resigned before being terminated as a result of failing the opportunity period, the mere fact that he was placed on the opportunity period may well have dissuaded a reasonable employee from filing a charge of discrimination.

As for the referral to the IRS investigative unit concerning Plaintiff's credit card, the documentation accompanying the referral includes a letter stating that Van Order proposed to suspend him for two weeks without pay. Ex. E to Parks Dep. Although he was never actually suspended, under the more liberal Burlington Northern standard, such an action is also arguably materially adverse.

Accordingly, the Court concludes that Plaintiff has demonstrated a prima facie case of retaliation. Based on the evidence presented, a reasonable jury could find that Plaintiff engaged in protected activity, Defendant knew of it, Defendant thereafter took an adverse action against him, and there was a causal connection between the protected activity and the adverse action. Genuine issues of material fact preclude summary judgment on this claim. Accordingly, Defendant's motion for summary judgment as to Plaintiff's retaliation claim is overruled.[12]

_____

[12] Defendant has argued only that Plaintiff cannot establish a prima facie case of retaliation. Because Defendant has not argued that Plaintiff cannot establish pretext, the Court proceeds no further in the McDonnell Douglas burden-shifting analysis. The Court notes, however, that Defendant first notified Plaintiff in March of 2006 that he might be placed on an opportunity period, yet waited until October of 2006, just two weeks after he filed his formal EEO Complaint, to actually commence that opportunity period. Moreover, Stose testified that Plaintiff was given the opportunity period because the agency had to "protect itself." Given this testimony and the timing involved, a jury could reasonably doubt Defendant's

## VI.    Punitive Damages

Plaintiff seeks punitive as well as compensatory damages.  Defendant, however, points out that the unambiguous language of the recovery provisions of the Civil Rights Act do not allow for an award of punitive damages against a government agency.  See Robinson v. Runyon, 149 F.3d 507, 516-17 (6th Cir. 1998) (citing 42 U.S.C. § 1981a(b)(1) and holding that Title VII explicitly exempts federal government agencies from punitive damages).  The Court therefore strikes Plaintiff's claim for punitive damages.

## VII.    Conclusion

For the reasons set forth above, Defendant's Motion for Summary Judgment (Doc. #21) is SUSTAINED IN PART AND OVERRULED IN PART.  Defendant is entitled to summary judgment with respect to Count I of Plaintiff's Complaint, the claims of disparate treatment and hostile work environment based on race. However, genuine issue of material fact preclude summary judgment on Count II of Plaintiff's Complaint, the retaliation claim.

Counsel will take note that a conference call will be convened at 4:45 p.m. on Thursday, December 22, 2011, for the purpose of setting a trial date and other dates leading to a resolution of this litigation.

Date:  December 9, 2011

WALTER HERBERT RICE, JUDGE
UNITED STATES DISTRICT COURT

---

explanation and find that the decision was motivated by a retaliatory animus.

32

Copies to:

Counsel of Record